UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| PHYLLIS GIVENS,<br><br>        Plaintiff,<br><br>  v.<br><br>EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; AND TRANS UNION, LLC,<br><br>        Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Phyllis Givens ("Plaintiff" or "Ms. Givens"), by and through the undersigned counsel, brings this Complaint and Demand for Jury Trial ("Complaint") against Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union"), together as "Defendants," alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.

**JURISDICTION AND VENUE**

1. Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681, *et seq*.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

4. Defendants regularly transact business within the District. Defendants regularly direct business at the District. Defendants voluntarily and purposefully avail themselves of the protections of the District, such that personal jurisdiction is established.

1

## PARTIES

5. Plaintiff, Phyllis Givens, is a natural person who resides in Tarrant County, Texas. Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

6. Defendants regularly compile and distribute consumer credit information in exchange for monetary compensation. Therefore, Defendants are "consumer reporting agenc[ies]" as defined in 15 U.S.C. § 1681a(f).

7. Equifax maintains a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309. Equifax may be served through its registered agent, c/o Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

8. Experian maintains a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626. Experian may be served at its principal place of business.

9. Trans Union maintains a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union may be served through its registered agent, c/o Prentice Hall Corporation, located at 801 Adlai Stevenson Drive, Springfield, Illinois 36106.

10. At all times relevant to this Complaint, Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## FACTUAL ALLEGATIONS

11. Plaintiff incorporates the above paragraphs of this Complaint as though they are fully detailed herein.

12. On or about September 14, 2021, Plaintiff first discovered she was being reported as deceased by Experian.

13. Plaintiff was disturbed by this information and concerned as to how Experian would come to this conclusion since she was, in fact, alive.

14. As will be discussed in greater detail below, Plaintiff attempted to resolve the issue with Experian over the phone.

15. On or about September 15, 2021, Plaintiff first discovered she was being reported as deceased by Trans Union.

16. On or about September 16, 2021, Plaintiff first discovered she was being reported as deceased by Equifax.

17. Plaintiff was shocked that Trans Union and Equifax were also reporting her as deceased.

18. Hoping that the reporting was an isolated mistake that would be corrected shortly, and since Plaintiff was in need for credit, she applied for credit.

19. On or about September 22, 2021, Plaintiff applied for a Capital One/Walmart ("Capital One") credit card.

20. On or about September 22, 2021, Plaintiff received a denial letter from Capital One informing her that she cannot be pre-approved for a Walmart credit card at this time.

21. The letter stated that the reason for her denial was because "Based on [Plaintiff's] credit report from one or more of the agencies below, submitter is reported as deceased."

22. The "below agencies" included Equifax, Experian, non-party LexisNexis, and Trans Union.

23. Upon information and belief, Equifax, Experian, and Trans Union all provided Capital One with a copy of Plaintiff's consumer report on or about September 22, 2021.

24. Upon information and belief, Equifax, Experian, and Trans Union were all reporting Plaintiff as deceased when they provided Capital One with Plaintiff's consumer reports.

25. The letter also indicated that Capital One received Plaintiff's credit score from Trans Union.

26. Specifically, one of the "key factors that adversely affected [Plaintiff's] credit score" was "score not available; insufficient or unknown credit history."

27. Upon information and belief, Trans Union provided Capital One with information indicating that Plaintiff's credit score was "unavailable" or incalculable.

28. Upon information and belief, Trans Union was unable to calculate Plaintiff's credit score because it inaccurately reporting Plaintiff as "deceased."

29. Thereafter, Plaintiff regularly monitored her Credit Karma account to see whether the inaccurate reporting was corrected.

30. To her dismay, the issue persisted.

31. On or about October 6, 2021, Plaintiff called the Social Security Administration ("SSA") to confirm that its records were not inaccurately indicating she was "deceased."

32. However, Plaintiff was unable to get ahold of anyone at the SSA after trying for two days.

33. Plaintiff called multiple times, and each time, she was on hold for fifteen to twenty minutes before the call disconnected.

34. Eventually, Plaintiff was able to schedule an appointment for an in-person meeting, but unfortunately, her local SSA office was booked until the following month, November 2021.

35. On or about November 4, 2021, Plaintiff confirmed with the SSA that she was not listed as "deceased" in their records.

36. In or around November 2021, Plaintiff attempted to use her Home Depot credit card.

37. Plaintiff's credit card was declined because the account was closed.

38. Plaintiff then called Home Depot to inquire as to why her credit card account was closed.

39. Upon information and belief, the representative informed Plaintiff that on or about November 20, 2021, one of the consumer reporting agencies reported Plaintiff as deceased to Home Depot. Therefore, her account was closed.

40. Upon information and belief, Equifax was the consumer reporting agency that reported Plaintiff as "deceased" to Home Depot.

41. As of the filing of this Complaint, Plaintiff's account is still closed, and she is working with Home Depot to reopen her account.

### Facts Related to Experian

42. On or about September 14, 2021, Plaintiff received an email from "Experian Alerts."

43. The email stated "We have been notified that the Social Security number associated with this account belongs to someone who is deceased…"

44. Plaintiff immediately called the phone number listed in the email to try and resolve the issue.

45. Upon information and belief, a representative of Experian informed Plaintiff that she was being reported as deceased by non-party Lending Club Corp. ("Lending Club").

46. The representative also initiated a dispute on her behalf as a result of the phone call.

47. On or about September 15, 2021, Plaintiff reviewed her Experian credit score through her Experian account.

48. Plaintiff was shocked to see that her credit score was unavailable.

49. Upon information and belief, the reason that Experian was unable to calculate Plaintiff's credit score was because Experian was inaccurately reporting her as deceased.

50. Plaintiff also reviewed her Experian consumer report and confirmed that she was being reported as deceased in both of her Lending Club tradelines (Account Numbers 14296XXXX and 16144XXXX).

51. On or about October 7, 2021, Plaintiff received an email from Experian informing her that the results of her dispute were now available through her online Experian account.

52. A cursory review of Plaintiff's consumer report revealed that Experian removed the deceased notation on or about October 7, 2021.

53. On or about November 16, 2021, Plaintiff requested a copy of her Experian consumer report to confirm the deceased notation did not reappear.

54. Upon review, Plaintiff observed that she was not being reported as deceased.

55. Additionally, both of Plaintiff's Lending Club tradelines indicated in the "Reinvestigation Info" section that "This item was updated from our processing of your dispute in Oct. 2021."

**Facts Related to Trans Union**

56. On or about September 15, 2021, Plaintiff reviewed her Trans Union credit score and consumer report via Credit Karma.

57. Plaintiff was shocked to see that her credit score indicated a score of "1."

58. Upon information and belief, a credit score of "1" indicates that a consumer has no credit history and/or that the credit score is incalculable.

59. Upon information and belief, the reason that Trans Union was unable to calculate Plaintiff's credit score was because Trans Union was inaccurately reporting Plaintiff as "deceased."

60. Plaintiff then reviewed her consumer report and was again shocked to see that she was reported as "deceased" in the "remarks" section of her two Lending Club tradelines (Account Numbers 14296**** and 16144****).

61. Thereafter, Plaintiff routinely checked her Credit Karma account to see whether the inaccuracy was corrected.

62. Plaintiff continued to observe the "deceased" notation until on or about October 8, 2021.

63. Upon information and belief, Trans Union removed the "deceased" notation in or around October 2021.

**Facts Related to Equifax**

64. On or about September 16, 2021, Plaintiff reviewed her Equifax credit score and consumer report via Credit Karma.

65. Plaintiff was shocked to see that her credit score indicated a score of "1."

66. Upon information and belief, a credit score of "1" indicates that a consumer has no credit history and/or that the credit score is incalculable.

67. Upon information and belief, the reason that Equifax was unable to calculate Plaintiff's credit score was because Equifax was inaccurately reporting Plaintiff as "deceased."

68. Plaintiff then reviewed her consumer report and was again shocked to see that she was reported as "deceased" in the "current payment status" and "worst payment status" sections of her two Lending Club tradelines.

69. Thereafter, Plaintiff routinely checked her Credit Karma account to see whether the inaccuracy was corrected.

70. Plaintiff continued to observe the "deceased" notation on her Equifax consumer reports via Credit Karma until on or about December 8, 2021.

71.     Upon information and belief, Equifax removed the "deceased" notation in or around December 2021.

**Facts Related to All Defendants**

72.     In or around July 2021, Plaintiff began the approval process for a mortgage with Better Mortgage ("Better").

73.     In or around September 2021, the representative Plaintiff was working with informed her that her credit scores were unavailable and that until this was fixed, the approval process was on hold.

74.     Upon information and belief, Experian and Equifax provided information to Better indicating that Plaintiff's credit score was unavailable or that Plaintiff was deceased.

75.     As Plaintiff had already put in her 60-day notice with her apartment complex, Plaintiff had to move in with her daughter that lived over forty-five minutes away.

76.     In or around October 2021, Plaintiff began working with a different mortgage company.

77.     Instead of being able to purchase a newer home, Plaintiff was left with the option to enter into a "lease to own" agreement for an older home.

78.     In or around November 2021, Plaintiff signed the "lease to own" agreement for the older home.

79.     After a month of living with her daughter, Plaintiff packed up her belongings and hired movers yet again.

80.     Upon information and belief, Defendants failed to maintain reasonable procedures to suppress the repeatedly inaccurate information furnished by Lending Club, despite being on notice that the information was inaccurate.

81. Upon information and belief, none of the Defendants actually received information from the Social Security Administration that indicated Plaintiff was deceased.

82. Rather, each of the Defendants "learned" that Plaintiff was "deceased" from the furnisher, non-party Lending Club.

83. Upon information and belief, Lending Club furnished information to the Defendants beginning in or around September 2021 that indicated Plaintiff was "deceased."

84. Simultaneously, each of the Defendants were receiving information from other data furnishers that indicated Plaintiff was applying for credit, using accounts, and making monthly payments.

85. Upon information and belief, Defendants knew or had reason to know Lending Club was an unreliable furnisher of consumer information.

86. Upon information and belief, Defendants blindly reported the information furnished by Lending Club without regard for its unreliability.

87. Upon information and belief, Defendants inaccurately reported Plaintiff as deceased while simultaneously receiving information that directly conflicted with Plaintiff being deceased.

88. For at least a month after inaccurately reporting that Plaintiff was "deceased," Experian and Trans Union continued to report Plaintiff's ongoing transactions.

89. For at least three months after inaccurately reporting that Plaintiff was "deceased," Equifax continued to report Plaintiff's ongoing transactions.

90. Typically, deceased persons do not apply for credit, use accounts, or make monthly payments (in the absence of fraud).

91. Defendants also reported Plaintiff's credit score was "1" and/or unavailable.

92.     Upon information and belief, a credit score of "1" indicates that a consumer has no credit history and/or the credit score is incalculable.

93.     Plaintiff has more than ten open accounts on her consumer reports, many of which are positive.

94.     A person with at least ten credit accounts undeniably has enough credit history to calculate a credit score.

95.     Upon information and belief, the inaccurate deceased notation in the Lending Club tradelines is why Defendants reported that Plaintiff's credit score could not be calculated.

96.     Therefore, Plaintiff's ongoing credit transactions and "incalculable" credit score gave Defendants constructive notice that Plaintiff was not "deceased," and the information furnished by Lending Club was inaccurate.

97.     But despite having notice of Plaintiff's aliveness and reporting her ongoing credit transactions, Defendants continued to sell information to third parties that indicated Plaintiff was "deceased."

98.     Upon information and belief, a deceased person does not have a consumer report that is accessible to creditors.

99.     Upon information and belief, a deceased notation on a consumer report indicates a high risk of fraud and is scored as a high risk of fraud.

100.    Upon information and belief, Defendants continued to report Plaintiff as "deceased" without flagging Plaintiff's credit files for fraud or identity theft when third parties requested her credit file.

101.    Upon information and belief, Experian sold Plaintiff's consumer credit information to third parties while reporting Plaintiff as deceased.

102. Upon information and belief, Trans Union sold Plaintiff's consumer credit information to third parties while reporting Plaintiff as deceased.

103. Upon information and belief, Equifax sold Plaintiff's consumer credit information to third parties while reporting Plaintiff as deceased.

104. As a direct result of Defendants' conduct, Plaintiff has suffered actual damages, including but not limited to: stress, anxiety, mental anguish, sleepless nights, emotional distress, wasted time, invasion of privacy, decreased creditworthiness, inability to apply for credit, credit denial, financial strain, and other damages continuing in nature.

105. As a direct result of Defendants' conduct, Plaintiff's approval process for a mortgage was put on hold.

106. As Plaintiff already gave her apartment complex her notice that she would be moving out, Plaintiff had to move in with her daughter over forty-five minutes away.

107. Plaintiff had to hire movers and put some of her possessions into storage since her daughter's home could not fit all of her things.

108. Plaintiff then had to hire movers again a month later when she was able to move into her own home.

109. Unfortunately, by the time Plaintiff was approved through a different mortgage company, she could only qualify for an older home under a "lease to own" agreement.

110. Upon information and belief, had Defendants not inaccurately reported Plaintiff as deceased, Plaintiff likely would have been approved by Better at more favorable rates and likely would have been able to purchase a newer home in September.

111. As a direct result of Defendants' conduct, Plaintiff was denied pre-approval for a Capital One Walmart credit card.

112. As a direct result of Equifax's conduct, Plaintiff's Home Depot credit card account was closed.

113. When Plaintiff's card was closed, she lost access to discounts and benefits offered by Home Depot.

114. As a direct result of Defendants' conduct, Plaintiff suffers from stress.

115. As a direct result of Defendant's conduct, Plaintiff suffers from panic attacks in the middle of the night and sleepless nights.

116. Defendants' conduct has also caused tension between Plaintiff and her children; Plaintiff lived with her daughter for approximately one month and was forced to borrow money from her daughter and one of her two sons.

117. Plaintiff has also been distracted while working for her son's business as a result of Defendants' conduct.

## COUNT I
### Defendants' Violations of 15 U.S.C. § 1681e(b)

118. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

119. The FCRA requires consumer reporting agencies, like Defendants, to maintain reasonable procedures to ensure they compile and disburse consumer credit information with maximal accuracy. 15 U.S.C. § 1681e(b).

120. Defendants violated 15 U.S.C. § 1681e(b) by failing to establish, maintain, and/or follow reasonable procedures to assure maximum possible accuracy in the preparation and maintenance of Plaintiff's consumer reports and credit files.

121. Defendants failed to establish or maintain procedures that would prevent them from reporting information contrary to its own knowledge and data.

122. Specifically, Defendants failed to maintain procedures that ensured they did not report Plaintiff as deceased while simultaneously updating her consumer reports with information that indicated Plaintiff was alive (monthly payments, ongoing credit card usage, etc.).

123. If Defendants did in fact believe that Plaintiff was deceased, they unreasonably failed to maintain any procedure or policy that alerted them to ongoing credit transactions allegedly associated with a deceased person's personal identifiers.

124. If Defendants did in fact believe that Plaintiff was deceased, they unreasonably failed to flag Plaintiff's credit file for fraud or identity theft when third parties requested her credit file.

125. Upon information and belief, Defendants have been sued by other consumers in the past who have alleged dispute procedures were unreasonable and violative of the FCRA.

126. Therefore, Defendants received actual notice of their deficient procedures.

127. In this case, however, Defendants received actual notice that their procedures were unreasonable as applied to Plaintiff.

128. It is wholly unreasonable to maintain procedures that allow blind reliance on the information provided by the furnisher of disputed information, especially when the information provided by a furnisher conflicts with information the consumer reporting agencies know to be true.

129. As a result of Defendants' conduct, action, and inaction, Plaintiff has suffered actual damages, including but not limited to: stress, anxiety, mental anguish, sleepless nights, emotional distress, wasted time, invasion of privacy, decreased creditworthiness, inability to apply for credit, credit denial, financial strain, and other damages continuing in nature.

130. Defendants' violations of the FCRA were willful and knowing. Therefore, Defendants are each individually liable to Plaintiff for actual, statutory, and punitive damages in an amount to be determined at trial. 15 U.S.C. § 1681n.

131. Alternatively, Defendants' violations of the FCRA were negligent. Therefore, Defendants are each individually liable to Plaintiff for statutory and actual damages. 15 U.S.C. § 1681o.

132. In any event, Defendants are each individually liable for Plaintiff's reasonable attorney's fees and costs. 15 U.S.C. §§ 1681n, 1681o.

## TRIAL BY JURY

133. Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

134. WHEREFORE, Plaintiff, Phyllis Givens, respectfully requests judgment be entered against Defendants, for the following:

    A. Actual damages pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

    B. Statutory damages pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

    C. Punitive damages pursuant to 15 U.S.C. § 1681n;

    D. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

    E. All pre-judgment and post-judgment interest as may be allowed under the law; and

    F. Any other and further relief as the Court may deem just and proper.

//

//

Dated: January 6, 2022                    /s/ *Roger L. Mandel*
                                                            Roger L. Mandel, TX Bar #12891750
                                                            Jeeves Mandel Law Group, P.C.
                                                            2833 Crockett St. Suite 135
                                                            Fort Worth, TX 76107
                                                            T: (214) 253-8300
                                                            E: rmandel@jeevesmandellawgroup.com
                                                            *Attorney for Plaintiff*
                                                            Phyllis Givens